IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DUANE BARTELS,                          *
                                        *
        Plaintiff,                      *
                                        *
        v.                              *           CV 414-075
                                        *
402 EAST BROUGHTON STREET, INC.,*
d/b/a SOUTHERN MOTORS ACURA,            *
                                        *
        Defendant.                      *

_____

O R D E R

_____

Presently before the Court is Defendant's motion for summary judgment (Doc. 40). For the reasons below, Defendant's motion is **GRANTED**.

## I. BACKGROUND

The present dispute arises out of Plaintiff's employment with Defendant, the owner and operator of Southern Motors Acura, a car dealership in Savannah, Georgia. (Bartels Decl., Doc. 56-1, ¶ 2.) After Plaintiff worked in various capacities for Defendant since 2004, Defendant terminated his employment on October 23, 2012. In response, Plaintiff filed a complaint with this Court on April 14, 2014, alleging that Defendant had interfered with his right to leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and had retaliated against him for exercising this right. (Doc. 1.) The facts

underlying Plaintiff's claims, viewed in the light most favorable to him, are as follows.

Originally hired by Defendant in 2004 as a wholesale parts salesman, Plaintiff was promoted to service manager and service parts director before becoming Defendant's general manager in late 2011. (Bartels Dep. I, Doc. 56-6, at 19, 44.) As general manager, Plaintiff reported to three of Defendant's six owners, Myron Kaminsky and his two sons, Adam and Ross. (Myron Dep., Doc. 56-15, at 23-24; Adam Dep., Doc. 56-17, at 51.)

In his capacity as general manager, Plaintiff made positive contributions to Defendant's business. During the months January 2012 through September 2012, Plaintiff oversaw the sale of sixteen more new Acura vehicles than Defendant had sold during the same months in 2011. (Myron Dep., Doc. 56-16, Ex. 71-72, at 18-25.) For his performance, Plaintiff, on multiple occasions, received positive reinforcement from the Kaminskys. For example, on July 1, 2012, Adam sent Plaintiff the following text message: "Great job this month. The report looks good!!" (Adam Dep., Doc. 56-17, at 152; Adam Dep., Doc. 56-18, Ex. 62, at 6.) Then, on July 2, 2012, in response to Plaintiff's statement that he had exceeded his sales goals and had moved over sixty units for the quarter, Ross sent Plaintiff the following text message: "Ok cool. Good job." (Bartels Dep. II,

Doc. 56-8, at 50-51; Bartels Dep. II, Doc. 56-11, Ex. 11, at 9-10.)

On October 12, 2012, well into his new position, Plaintiff attended a doctor's appointment with his pregnant wife. (Bartels Dep. I, Doc. 56-6, at 54-55.) At that appointment, Plaintiff learned that the bones of his unborn child were "less than five percent and heavily curved." (Id. at 55.) As he walked outside of the hospital, Plaintiff called Myron to inform him of this information and to relay that he would be attending a perinatologist appointment with his wife later that day. (Id. at 54-56.) Myron replied by telling Plaintiff to stay in touch and keep him informed. (Id.) Accordingly, Plaintiff left Myron a voicemail the next day, October 13, confirming the earlier results, informing him of their next appointment on October 15, and relaying that his wife and he were considering terminating the pregnancy. (Id. at 59-61.)

On October 14, a day on which the dealership was closed, Plaintiff did not communicate with anyone affiliated with Defendant. (Id. at 65.) However, following a doctor's appointment on October 15, Plaintiff sent a text message to Ross informing him that he would be in touch with an update. (Ross Dep., Doc. 56-19, at 113-14.) Then, on the sixteenth, Plaintiff sent a text message to Myron indicating that his wife and he would be attending an appointment with a specialist that day.

3

(Myron Dep., Doc. 56-15, at 151; Ex. 49, Doc. 56-16, at 17.) Also on the sixteenth, Plaintiff received a text message from Ross saying the following: "We all wish u beat [sic] of luck with baby. She will be in our prayers." (Ross Dep., Doc. 56-19, at 119; Ex. 38, Doc. 56-16, at 17.)

Ultimately, on October 17, 2012, Plaintiff returned to work. (Bartels Dep. I, Doc. 56-6, at 29.) However, before arriving that day, Plaintiff received a phone call from Ross during which Ross stated that "life goes on, we have a business to run, you need to get back to work." (Id. at 71.) That evening, Plaintiff attended a managers' meeting at the Exchange Tavern in Savannah. (Id. at 83.) At its conclusion, Plaintiff met with Myron, Ross, and Adam and informed them that (1) his unborn daughter's bones "were less than the five [sic] percentile and they were heavily bowed and curved"; (2) he would need time off in the future; and (3) he did not know exactly when he needed time off because the pertinent test results would not be back for six weeks. (Id. at 86-88.)

Meanwhile, two days later, on Friday, October 19, 2012, Katherine Albert and other Historic Savannah Foundation ("HSF") volunteers arrived at Defendant's dealership to make final preparations for the foundation's "After Glow" benefit to be held there the next night. (Albert Aff., Doc. 40-1, ¶¶ 3, 6.) In the preceding months, as she arranged for Defendant's

4

dealership to hold the function she was chairing, Albert had been introduced to Plaintiff as she met with Myron or Mickey Rhinehart, Defendant's longtime employee. (Id. ¶¶ 3-5.) Yet, despite Albert's established relationship with Defendant, Plaintiff approached her on the nineteenth and relayed that he had a "bone to pick" with her. (Albert Dep., Doc. 40-2, at 39.) Plaintiff stated to Albert that all of her planning should have been coordinated through him and not through Rhinehart. (Albert Aff. ¶ 5.) Considering the manner in which Plaintiff spoke to her to be "extremely unprofessional," Albert also alleges that Plaintiff demonstrated other behavior that she considered inappropriate and unprofessional. (Id. ¶ 6.) According to Albert, yet disputed by Plaintiff, Plaintiff (1) used profanity when asking why he had not been given tickets to the event; (2) stated guests at his own social gatherings used flowerpots to relieve themselves; (3) used profanity when directing Albert not to move his desk for the event; and (4) complained to an assembled group of Defendant's employees about the need to coordinate within a short time frame. (Id. ¶¶ 9-10; Albert Dep., Doc. 40-2, at 62-63, 66.)

Considering Plaintiff's behavior to be "so demeaning and embarrassing," Albert telephoned HSF's development director, Terri O'Neil, after she left the dealership on October 19. As part of that conversation, Albert informed O'Neil that she would

not be returning to the dealership to fulfill her commitment as "After Glow" chair unless Plaintiff "was no longer on the premises." (Albert Aff. ¶ 13.) With this information, O'Neil then called Myron. According to Myron, O'Neil disclosed that Plaintiff told Albert that "he was the boss and she should be talking to him and 'F' word this and – and just started cursing at her and – [being] inappropriate." (Myron Dep., Doc. 56-15, at 167-68.) Never "as embarrassed or as disappointed or as angry" as he was then, Myron called Plaintiff soon after talking to O'Neil to inform him of the complaint and to instruct him to contact the ladies and apologize. (Id. at 167.) Accordingly, Plaintiff later apologized to O'Neil for his behavior both by phone on October 19 and in person on October 20. (Bartels Dep. I, Doc. 56-6, at 107; O'Neil Dep., Doc. 56-23, at 43-46.) After receiving his phone call on the nineteenth, O'Neil relayed to Myron that Plaintiff had apologized. (O'Neil Dep. at 46.)

Allegedly based solely on the information he received from O'Neil regarding Plaintiff's conduct, Myron decided to terminate Plaintiff's employment. (Myron Dep., Doc. 56-15, at 158.) After reaching this decision, Myron informed Adam and Ross of his intentions. (Id. at 158-60.) Having previously expressed their concern over Plaintiff's effectiveness as general manager, Adam and Ross were content with their father's decision. (Adam Dep., Doc. 56-17, at 125-26; Ross Dep., Doc. 56-19, at 145-46.)

Therefore, on the morning of Tuesday, October 23, 2012, Myron and Adam met with Plaintiff in the dealership conference room. (Bartels Dep. I, Doc. 56-6, at 103-04.) Adam initiated the conversation by telling Plaintiff that he "was going to think [they were] the biggest shitbags in the world." (Id. at 104.) Then, Adam relayed to Plaintiff that the family had gotten together over the previous weekend, discussed matters, and decided that October 23 would be his last day of employment. (Id.) Adam further stated that Plaintiff "had done nothing wrong" and that their decision was "purely a business decision." (Id.) Myron then addressed Plaintiff stating that "he knew what [Plaintiff] was going through because Adam . . . had had a miscarriage." (Id.) Myron also told Plaintiff that they were going to give him a three months' severance package and a letter of reference. (Id.)

Weeks later, on November 13, 2012, Ross completed a separation notice regarding Plaintiff's termination that was submitted to the Georgia Department of Labor. (Ross Dep., Doc. 56-19, at 49.) Within that document, Ross indicated that Plaintiff had been discharged for the following reasons:

1. Failure to work well with others (both subordinates, community members, and superiors). For example:

   -Acura representative would not visit store due to poor relationship with [Plaintiff].

> -Productive salespersons resign because of [Plaintiff's] temper and abrasiveness.
>
> -Other current employees voiced numerous complaints.
>
> -Cursing at and upsetting member of [HSF] during fund raising event.

2. Failure to meet minimum production requirements (sales and finance agreed on by both parties at time of promotion from service department).

3. Use of company credit card for personal services. (i.e., meals)

4. Overall poor attitude which created hostile work environment.

5. Failure to properly account for incentive objectives which led to at least $160000 in lost funds.

6. Uncontrolled spending without approval throughout store.

(Ross Dep., Doc. 56-20, Ex. 8, at 1.) Despite these termination reasons, Plaintiff, during his time as general manager, was never disciplined, written up, or told that he was in jeopardy of losing his job. (Adam Dep., Doc. 56-17, at 135; Ross Dep., Doc. 56-19, at 66-69.)

Following the birth of his daughter in February 2013, Plaintiff filed his complaint seeking redress under the FMLA. (Desiree Decl., Doc. 56-3, ¶ 5.) After filing its answer (Doc. 9), Defendant filed the instant motion for summary judgment (Doc. 40). Thereafter, in compliance with _Griffith v. Wainwright_, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), the

Clerk provided Plaintiff with notice of the summary judgment motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 41.) Subsequently, Plaintiff filed a response (Doc. 54), Defendant filed a reply (Doc. 62), and Plaintiff filed a sur-reply (Doc. 66). Consequently, Defendant's motion is now ripe for the Court's consideration.

## II. DISCUSSION

Defendants' motion for summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating the contentions of the parties, the Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

Initially, the moving party bears the burden and must show the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before evaluating the non-movant's response in opposition, the Court must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact,

the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Instead, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

## A. FMLA Interference

Under the FMLA, an interference claim "has two elements: (1) the employee was entitled to a benefit, and (2) [his] employer denied [him] that benefit." White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015).

### 1. Benefit Entitlement

To be entitled to an FMLA benefits, an employee must, *inter alia*, (1) "suffer from a serious health condition that makes [him] unable to perform the functions of [his] position" and (2) "give proper notice" to his employer. Id. at 1194-95.

### a. Serious Health Condition

Under 29 C.F.R. § 825.120(a)(5), "[a] spouse is entitled to FMLA leave if needed to care for a pregnant spouse who is incapacitated or if needed to care for her during her prenatal care, or if needed to care for her following the birth of a child if she has a serious health condition." Similarly, "[b]oth parents are entitled to FMLA leave if needed to care for a child with a serious health condition if the requirements of §§ 825.113 through 825.115 and 825.122(d) are met." Id. § 825.120(a)(6).

A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves[] (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). However, in making a determination on this issue, the Court is not limited to the "evidence received by the employer." White, 789 F.3d at 1194. Rather, the Court should use "all available evidence" in its inquiry. Id. at 1194-95 ("It may first seem unfair to the employer . . . to make the serious-health-condition determination using evidence that the employer did not see until after it made the determination. But . . . other provisions in the FMLA protect employers from being sandbagged.").

Here, Plaintiff has provided enough evidence to produce a genuine dispute as to whether his wife and his daughter had a serious health condition for which he was entitled to FMLA leave. First, because she was hospitalized and thus unable to "perform other daily activities" due to her pregnancy, Plaintiff's wife had "a serious health condition involving continuing treatment by a health care provider." 29 C.F.R. § 825.115(b). (See Desiree Decl. ¶¶ 5-6.) Additionally, because Plaintiff's daughter remained in the neonatal intensive care unit of the hospital for two nights, she had a serious health condition involving inpatient care. 29 C.F.R. §§ 825.113-825.114. (See Desiree Decl. ¶¶ 5-6.)

### b. Proper Notice

"An employee's notice of [his] need for FMLA leave must satisfy two criteria – notice and content." White, 789 F.3d at 1195. Regarding notice, when an employee's need for leave is foreseeable, as it is here, he must give his employer "at least 30 days' advance notice, unless giving 30 days' notice is impracticable, in which case the employee must give only 'such notice as is practicable.'" Id. (quoting 29 U.S.C. § 2612(e)(2)). By informing the Kaminskys on the evening of October 17, 2012, that he would need time off in the future as a result of his wife's pregnancy, Plaintiff has raised a genuine dispute as to whether the timing of his FMLA notice was

sufficient. As for the sufficiency of the contents of his notice, that is a more difficult question. The FMLA requires that the contents of an employee's notice be "'sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and [of] the anticipated timing and duration of the leave.'" Id. at 1196 (quoting 29 C.F.R. § 825.302(c)). "From there, when the employee gives sufficient notice to [his] employer that potentially FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence qualifies for FMLA protection." Id. (citing 29 C.F.R. § 825.303(b))(internal quotation marks and other citations omitted).

In this case, the Court finds no evidence indicating that Plaintiff used the words "Family Medical Leave Act" or the acronym "FMLA" at any point in his conversations with the Kaminskys. However, Plaintiff has produced evidence indicating that he informed Myron of the following: (1) his pregnant wife was experiencing problems with their unborn child; (2) he and his wife had' seen multiple doctors, including at least one specialist; (3) he would need time off in the future as a result of this complicated pregnancy; and (4) he did not know exactly when he would need time off because important test results would not be back for six weeks. Additionally, the record reflects that, with respect to his communications with Defendant,

Plaintiff was fully transparent and timely forthcoming "with as much information as [he] had available to [him]." Wai v. Federal Express Corp., 461 F. App'x 876, 883 (11th Cir. 2012). Thus, given the information provided and Plaintiff's completeness and timeliness in providing it, the Court finds that a genuine dispute exists as to whether notice was adequately given. See id.

### 2. Benefit Denial

An employee's right to FMLA leave has been interfered with, quite clearly, when his employer terminates him "in order to avoid having to accommodate [him] with rightful FMLA leave rights once [he] becomes eligible." Pereda v. Brookdale Senior Living Cmtys., Inc., 666 F.3d 1269, 1275 (11th Cir. 2012). Yet, "an employee can be dismissed, preventing [him] from exercising [his[ right to commence FMLA, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). Consequently, the Court's inquiry as to whether an employee would have been dismissed regardless of his FMLA request is essentially the same as the Court's query as to whether an employer's asserted reasons for termination are simply a pretext for retaliation. See Hawkins v. BBVA Compass Bancshares, Inc., No. 2:12-cv-03922, 2014 WL 4715865, at *16 (N.D. Ala. Sept. 22, 2014). For this reason,

the ability of Plaintiff's FMLA interference claim to withstand summary judgment will depend upon the outcome of the pretext determination below.

## B. FMLA Retaliation

To establish a prima facie case of FMLA retaliation, Plaintiff "must show that: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). If Plaintiff makes this showing, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." Id. "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Id.

Based on the evidence submitted and the interference analysis above, Plaintiff has met his burden of establishing a genuine dispute as to whether he engaged in activity protected by the FMLA and suffered an adverse employment action. See Pereda, 666 F.3d at 1276 ("[A] pre-eligible request for post-eligible leave is protected activity."). Additionally, because Plaintiff was terminated less than seven days after informing Defendant of his future need for leave, a genuine dispute exists regarding whether Plaintiff's invocation of his FMLA rights was

the cause of his termination. See Hurlbert, 439 F.3d at 1298 ("Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000))). Moreover, with evidence indicating that Plaintiff was terminated because of his behavior toward Albert, Defendant has provided a legitimate reason for its decision to terminate Plaintiff. Accordingly, in its remaining analysis, the Court need only determine whether Plaintiff has submitted sufficient evidence to withstand summary judgment on the issue of pretext.

"A plaintiff may show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Diaz v. Transatlantic Bank, 367 F. App'x 93, 97 (11th Cir. 2010)(quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). To do so, "a plaintiff may point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason." Id. (quoting Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006)). "However, a plaintiff cannot merely quarrel with the wisdom of the employer's reason, but

must meet the reason head on and rebut it." Id. (internal quotation marks and citation omitted). While close temporal proximity between the protected activity and an adverse employment action is evidence of pretext, it is "probably insufficient to establish pretext by itself." Hurlbert, 439 F.3d at 1298. Other evidence of pretext that courts have found significant includes "an employer's failure to articulate clearly and consistently the reason for an employee's discharge" and "an employer's deviation from its own standard procedures." Id. at 1298-99.

In addition to the close temporal proximity, Plaintiff argues that six other factors indicate that Defendant's termination rationale was pretext. Those factors and their significance are addressed below.

### 1. Separation Notice

As stated within the Kaminskys' depositions and as highlighted by Plaintiff's sur-reply, the decision to terminate Plaintiff was made by Myron. (Myron Dep., Doc. 56-15, at 157-59; Adam Dep., Doc. 56-17, at 55-56; Ross Dep., Doc. 56-19, at 147-48; Pl.'s Sur., Doc. 66, at 7.) However, almost a month after Plaintiff was informed of this decision, Ross completed a notice of separation providing at least six reasons for Plaintiff's termination. (Ross Dep., Doc. 56-19, at 49; Doc. 56-20, Ex. 8, at 1.) While acknowledging that Defendant has

disavowed any reason other than Plaintiff's conduct toward Albert, Plaintiff contends that this list of reasons demonstrates an inconsistency sufficient to withstand summary judgment. (Pl.'s Resp., Doc. 54, at 21-22.) In support of his position, Plaintiff points to a number of cases highlighting the significance of "shifting reasons" in courts' pretext determinations. (Id. at 22.)

In each of the cases submitted by Plaintiff, the relevant court ruled for a dismissed employee after finding that an employer diverted from its proffered termination rationale.[1] Yet, in this case, Defendant, within its notice of separation, did not divert from the reason Myron terminated Plaintiff. While the notice listed no fewer than five additional reasons for Plaintiff's termination, it, importantly, also referenced Plaintiff's behavior toward Albert as a contributing reason. Thus, the additional reasons provided are not contradictory reasons, but rather supplementary ones offered by Ross – one who was not the ultimate decision maker on this issue.[2] As a result, Plaintiff's argument and the cases raised are unpersuasive.

---

[1] See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1195 (11th Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000); Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 934 (11th Cir. 1995); Crabbe v. Am. Fid. Assurance Co., No. CIV-13-1358, 2015 WL 1977380, at *3 (W.D. Okla. Apr. 30, 2015); Connelly v. Metro. Atlanta Rapid Transit Auth., No. 1:11-CV-02108, 2012 WL 6765579, at *10 (N.D. Ga. Dec. 7, 2012); Stallworth v. E-Z Serve Convenience Stores, No. A. 99-D-1503-N, 2001 WL 125304, at *4 (M.D. Ala. Feb. 12, 2001).

[2] Plaintiff disputes the validity of these supplemental reasons.

## 2. Myron's Knowledge

Plaintiff next contends that because Myron had insufficient knowledge regarding Plaintiff's behavior toward Albert, Defendant's proffered termination rationale is pretextual. (Pl.'s Resp. at 23.) The Court finds this argument unpersuasive. Plaintiff has not offered sufficient evidence to rebut the fact that O'Neil informed Myron of the following prior to his termination: (1) Plaintiff told Albert that "he was the boss and she should be talking to him"; (2) Plaintiff used the "F" word in speaking with Albert; and (3) Plaintiff was otherwise "cursing at her and – [being] inappropriate." (Myron Dep., Doc. 56-15, at 167-68; O'Neil Dep. at 40-42.)

## 3. Plaintiff's Apology

Plaintiff also argues that the following present a genuine dispute as to whether Myron's termination rationale was pretextual: (1) Myron's knowledge that Plaintiff had "apologized and made things right with O'Neil" and (2) Myron's "positive response" upon learning that Plaintiff had "apologized to [O'Neil] for any bad behavior." (Pl.'s Resp. at 24.) However, simply because Myron knew that Plaintiff had "made things right with O'Neil," it does not necessarily follow that Myron had moved beyond the incident. The Court finds Plaintiff's evidence indicating that Myron gave a "positive response" upon learning of Plaintiff's apology insufficient for it to conclude that

Myron's termination rationale was not "an honest explanation for why he fired [Plaintiff]." (Id.) Put another way, this evidence does not constitute a head-on rebuttal of Defendant's proffered reason for termination. See Diaz, 367 F. App'x at 97 ("However, a plaintiff cannot merely quarrel with the wisdom of the employer's reason, but must meet the reason head on and rebut it.")(internal quotation marks and citation omitted).

### 4. Defendant's Toleration of Misconduct

Plaintiff further asserts that because Myron has overlooked similar employee misconduct in the past, his failure to do so in this instance is evidence of pretext. Specifically, Plaintiff highlights that Myron did not terminate (1) Rhinehart when his clients have called with "[c]onfusion" and "complaints about their deal" half a dozen times over seventeen years; (2) Dennis Purcell when "he got into a fistfight with another salesman on the car lot"; or (3) Jarred Pratt when he was routinely "high on drugs in front of customers and . . . slipping into unconsciousness."[3] (Rhinehart Dep., Doc. 56-21, at 77; Jacoby Decl., Doc. 56-4, ¶¶ 4-7.)

"A typical means of establishing pretext is through comparator evidence." Moon v. Kappler, Inc., No. 4:13-CV-1992,

---

[3] The evidence regarding Purcell and Pratt comes to the Court through the declaration of Fred Jacoby. (Doc. 56-4.) Defendant objects to this evidence on the grounds that Jacoby lacks personal knowledge and that his statements are without probative value. (Doc. 61 at 13-14.) After reviewing Defendant's arguments, the Court overrules its objections. The Court is satisfied that Jacoby's statements are based on personal knowledge and are sufficiently probative.

2015 WL 2381061, at *21 (M.D. Ala. May 19, 2015) (analyzing employer pretext in FMLA suit)(citing <u>Silvera v. Orange Cnty. Sch. Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001)). A comparator is "a similarly-situated employee who committed the same violation of work rules, but who was disciplined less severely than [the plaintiff]." <u>Id.</u> (internal quotation marks and citation omitted). "While there has been some dispute as to what the phrase 'similarly situated' means in this context, it is clear that the burden is on the plaintiff to show that the employees were 'similarly situated' in all relevant respects." <u>Id.</u> (internal quotation marks and citation omitted).

After a review of this evidence, the Court cannot conclude that these prior instances of employee misconduct indicate a genuine dispute as to employer pretext. Unlike Plaintiff's actions, the behavior of Purcell and Pratt does not constitute mistreatment of a potential customer or third party. Though Rhinehart's conduct can be classified as such, his actions are hardly the same as Plaintiff's. At worst, Rhinehart led third parties to believe that they were getting a more favorable deal than they were. (Rhinehart Dep. at 77.) Conversely, Plaintiff is accused of intentionally directing profanity and otherwise inappropriate behavior at a third party.

### 5. Termination of Past Employees

Plaintiff also states that Defendant's termination of a past employee who "needed or requested leave" is evidence of pretext in his case. In particular, Plaintiff points to the fact that Rhinehart was "directed to fire [Doug Thomson]" after Thompson's wife had been diagnosed with "serious respiratory problems and septic shock."[4] (Thomson Decl., Doc. 56-5, ¶ 4.) In Thomson's words:

> Shortly [after learning of my wife's diagnosis], I was told that I had to show up for a sales meeting on my day off. During the sales meeting, a sales consultant and I got into a debate about a sales technique and, at one point, I said I did not agree with him but in any event, my wife was ill and I should not even be there. A finance manager and a sales manager told me to go home and take some time off because of my wife, which I did. When I returned, Mickey Rinehart [sic] brought me into a meeting and fired me. He told me that my recent sales were not high enough, and that he was directed to fire me.

(Id.)

---

[4] For the same purpose, Plaintiff offers the following statement by Fred Jacoby: "I later heard from [Plaintiff] that Myron Kaminsky directed him to fire [Michael] Johnson because 'they couldn't have a guy with heart issues working' at the dealership." (Jacoby Decl. ¶ 8.) Myron's statement instructing Plaintiff to fire Johnson as a result of his heart issues would ordinarily be admissible as an opposing party's statement. See Fed. R. Evid. 801(2). However, because this statement comes to the Court only through Plaintiff's hearsay statement, it is not admissible unless Plaintiff's statement falls within an applicable exception. See Fed. R. Evid. 801, 805. Accordingly, because Plaintiff's statement does not fall within an exception, this statement, in its entirety, is inadmissible. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012). Thus, Defendant's objections as to paragraph eight of Jacoby's declaration are sustained. (Doc. 61 at 14-15.)

While the Court views this evidence as admissible and relevant to its present inquiry, the Court questions its probative value.[5] Certainly, this evidence can be viewed in a way to suggest that Thomson was terminated because Defendant feared an imminent FMLA request. However, this conclusion is belied by Thomson's failure to indicate (1) whether the person responsible for his termination knew of his wife's condition; (2) whether his wife's condition would have constituted a "serious health condition" within the meaning of 29 U.S.C. § 2611(11); and (3) whether Thomson made, or even planned to make, an FMLA request. Yet, perhaps most significantly, this conclusion is belied by the fact that Thomson admitted to "fail[ing] to sell as many cars . . . as the Kaminskys had set for me as a goal" — the very reason that Thomson was given for his termination. Accordingly, the Court does not find the information within Thomson's declaration to be sufficiently probative to allow Plaintiff to survive summary judgment. See Brooks, 446 F.3d at 1163 ("[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.")(internal quotations and citation omitted).

---

[5] To the extent out-of-court statements within the excerpt are offered for the truth of the matter asserted within, they are statements of an opposing party and are therefore admissible. See Fed. R. Evid. 801(d)(2). Consequently, Defendant's objection (Doc. 61 at 15) is overruled.

**6.  Statements Made by Defendant on the Termination Date**

At the termination meeting at which Adam, Myron, and Plaintiff were present, Adam told Plaintiff that he "had done nothing wrong" and that their decision was "purely a business decision." (Bartels Dep. I at 104.) Because Defendant contends that they terminated Plaintiff for his conduct toward Albert, Plaintiff argues that Defendant's rationale at the termination meeting is inconsistent and is thus evidence of pretext.

As Plaintiff maintains, the rationale given to Plaintiff at his termination meeting and the one now advocated by Defendant are inconsistent. As a result, Plaintiff has produced evidence that "may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Yet, such a showing will not "*always* be adequate to sustain a jury's finding of liability." Id. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Id. For instance, "'if the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent.'" Id. (citing Fisher v. Vassar Coll., 114 F.3d 1332, 1338 (2d Cir. 1997)).

Thus, in evaluating the inconsistency at hand, the Court must not limit its inquiry to simply the contents of Adam's statement. The Court must also consider evidence indicating that (1) Adam began the termination meeting by telling Plaintiff that he "was going to think [they were] the biggest shitbags in the world"; (2) Myron also told Plaintiff that "he knew what [Plaintiff] was going through because Adam . . . had had a miscarriage"; (3) Myron offered Plaintiff a three months' severance package and a letter of reference; (4) Plaintiff's statement that "Adam Kaminsky and Ross Kaminsky sent me text messages with prayers for my baby"; (5) Plaintiff's statement that, at his termination meeting, Adam and Myron expressed that they "felt bad for me"; and (6) Plaintiff's in-brief characterization of some of Myron's statements, on the day of Plaintiff's termination, as expressions of sympathy. (Bartels Dep. I at 104; Bartels Decl., Doc. 56-1, ¶¶ 6, 8; Pl.'s Resp. at 26.)

Evaluating this evidence in the context of all other evidence presented on the issue of Plaintiff's termination, the Court finds that no reasonable jury could find that Adam's initial termination rationale was given to conceal a discriminatory intent. Rather, the Court finds that the initial termination explanation was indisputably given to further the feelings of sympathy that both Myron and Adam carried.

Consequently, the Court is left only with the close temporal proximity between Plaintiff's FMLA notice and his termination on which to base its pretext determination. Without more, the Court cannot conclude that a genuine dispute exists as to whether Defendant's legitimate termination rationale was pretextual. For that reason, summary judgment is proper as to both Plaintiff's interference claim and his retaliation claim.

### III. CONCLUSION

For the reasons above, the Court **GRANTS** Defendant's motion for summary judgment (Doc. 40) and accordingly **DENIES AS MOOT** Defendant's motion for protective order (Doc. 28) and Plaintiff's motion to compel (Doc. 30). The Clerk is directed to **ENTER JUDGMENT** in favor of Defendant 402 East Broughton Street, Inc., and is further directed to **TERMINATE** all motions and deadlines and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _28th_ day of March, 2016.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA